## JOHN CARLSON v. THE STATE.

1. PRACTICE IN THIS COURT. — It is a settled rule that, in the absence of a statement of the facts in evidence before the court and jury, this court, on appeal, will only consider whether the indictment sustains the charge and the finding of the jury. See *Longley* v. *The State*, 3 Texas Ct. App. 611, and cases there cited.

2. MURDER — EVIDENCE. — By bill of exceptions it appears that the defence in a murder case attempted to prove that the defendant, who, after the killing, in 1866, had gone to Missouri, sent word, in 1867 or 1868, to the private prosecutor in this case that he (defendant) was living openly at C., in said State, and was anxious to return and stand his trial, but was too poor; which evidence was objected to by the State as irrelevant and immaterial. *Held*, that the court below did not err in sustaining the objection.

3. SAME. — A second bill of exceptions complains of the exclusion by the court of testimony sought, on cross-examination of the prosecuting witness, for the purpose of showing the *animus* of the witness. Its purport was that the witness had reliable information of the whereabouts of defendant for several years before he had the defendant brought back upon requisition, which was not done until several witnesses upon whom the defendant relied for his defence were dead. *Held*, that this testimony was properly excluded as immaterial. If the defendant chose to remain away until his witnesses died, instead of returning and placing himself under the protection of the law, he did so at his peril.

4. SAME. — A third bill of exceptions complains of the exclusion by the court of evidence on the *animus* of the prosecuting witness, tending to show (1) that he was informed, in 1869, that defendant was living openly at C., in the State of Missouri; (2) that the defendant sent word to said witness that he (defendant) was anxious to come back and stand his trial, but was too poor to pay his expenses; and (3) that the residence of the defendant was generally known in the county of the *forum* for many years before he was arrested. This bill of exceptions also shows that the prosecuting witness was a brother of the deceased. *Held*, that such testimony was properly excluded for irrelevancy and immateriality.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. WALKER, Special Judge.

The appellant was charged by indictment, filed November 1, 1866, with the murder of August Nelson, in Williamson County, on May 17, 1866.

Appellant was put upon his trial in Williamson County

on September 16, 1878, found guilty of murder in the second degree, and sentenced to nine years' confinement in the penitentiary, assessed as his punishment by the jury.

The special judge who tried the case, by an oversight, failed to certify the statement of facts, but filed an affidavit afterwards, setting out this omission as an inadvertence, as the statement had been prepared, examined, and approved. This uncertified statement of facts is embodied in the record, and from it we make the following synopsis of the testimony :

Andrew Nelson, the first witness for the prosecution, says that he is a brother of the deceased ; that, sometime in 1866, defendant told deceased that he (deceased) should not go to Georgetown and report on him about some horses which it had been alleged defendant and one Bargstrom had stolen ; that if he did, he (defendant) would hurt him (deceased). He further stated that they were rebels' horses, and being so, it was no harm to take them, and deceased should not report the taking. Something was said about a mule taken from a pasture. This all occurred about four or five days before the killing. On cross-examination, witness testified that he caused the requisition to be obtained for defendant, who had fled the State after the killing. Had himself employed counsel to prosecute defendant, yet wanted him to have a fair trial. Never heard deceased make threats against defendant; nor did he ever know that deceased had any ill feelings towards the defendant. The deceased was not quarrelsome. Remembers calling at Berryman's, three or four miles north of Austin, and saw Mr. Nilson there once, but did not tell Nilson that " I had defendant in jail, and had money enough to keep him there as long as I wanted to." I did tell him defendant was in jail. I never had a quarrel with defendant. Bargstrom and defendant were together when defendant spoke of deceased testifying against " us " (defendant and Bargstrom) in regard to the horses.

John T. Coffee, for the prosecution, swears that he saw deceased in the court-room on the day in the evening of which he was said to have been killed. Defendant and Bargstrom were also there. The occasion was the examining trial of Bargstrom for the alleged stealing of a horse, in which deceased was a witness for the State. Defendant, while deceased was on the stand, showed excitement, — talking Swedish, — seemed hostile, but can't say that the hostility was directed towards any one in particular. Knows defendant better now than then, and now knows him to be excitable from temperament; that his natural manner is impulsive, and that his excitement is part of his nature.

Thomas Gahagan, for the State, testified that he was at home on the night of the killing, about three-fourths of a mile from defendant's house. Between sundown and dark, heard a shot in the direction of defendant's. Before the killing — about one month — defendant told witness that he and deceased had quarrelled about a horse or mule; that deceased was crowding him, and trying to run over him; and that he (defendant) would hurt deceased before he would be run over thus. Defendant seemed to be enraged.

Ben Snyder, for the State, testified that he was present at a party at the house of the deceased, in 1866, when deceased and defendant had a row. Defendant and one Johnson were "jowering," when deceased interposed, saying he allowed no fuss there. Defendant had a gun. After this party, defendant and another Swede came to Nelson's and called witness to the fence. Defendant was talking to deceased about the deceased being a witness against him about some horses that had been stolen. Defendant asked deceased what he (deceased) would swear. Deceased replied that he had not reported them. Defendant said if deceased swore what he (defendant) had heard he would swear, he (defendant) would hurt deceased. This was a short time before the killing.

The testimony of one Harry recites the difficulty at the

party, referred to by the previous witness, but says the disturbance seemed to be general, and that all the parties — naming several — were drinking somewhat. Defendant was talking to the deceased, and was attended by Bargstrom.

J. G. Hartstrom, for the State, testifies that he is now a resident of Red Wing, Minnesota, but formerly lived at Austin, Texas. Was present when deceased was killed. Himself, Jonas Bargstrom, Christerson, and defendant were together, and stopped at defendant's house. Shortly after reaching the house, one Rosengreen and old man Christerson came up in a wagon, and next deceased and one Newlin came up. Deceased started to Rosengreen, as if to talk to him. Defendant came out, and ordered deceased to leave the premises, to which deceased responded that he had come to speak to Rosengreen, and not to defendant. This was repeated by the parties, respectively, two or three times, when the deceased got mad, and cursed defendant. Defendant said nothing, but walked fast into the house, distant some yards from the fence, where all this transpired. Deceased got off his horse on the left side. As soon as deceased got off his horse defendant was right there. Deceased was stooping down. Witness did not see all of his body, but defendant shot him. The parties were very close, and just outside defendant's fence. Before shooting, defendant said, " Go away, and leave ;" deceased got mad, and cursed the defendant. Did not see him have a gun until after he shot. After defendant shot, Newlin said, " You have killed my brother-in-law, but not me." Defendant then drew his gun, and Newlin ran off fast. Defendant went back into the house after deceased fell. Bargstrom and I carried the body into the defendant's house after he was killed, and found no knife or pistol on him. Did not see Carlson any more. Before the killing (same day, in the morning), defendant told the witness that he and deceased were bitter enemies ; that deceased was bothering

him a great deal, and he didn't think it "could be" unless one or the other be killed. On cross-examination, says that his expenses from Red Wing and back, and what his daily wages there amounts to, — $1.50 or $1.75 per day, — are paid him by Andrew Nelson, brother of the deceased, and the prosecuting witness. When deceased stooped and was shot, witness did not see him pick up a stone or stick. Never knew of deceased being in any fusses or difficulties.

The testimony of Andrew Newlin, for the State, is substantially the same as that of the prosecuting witness, except that on the day of the trial of Bargstrom before the examining court, referred to by Judge Coffee, the defendant became very angry while deceased was testifying against Bargstrom, and said that he (deceased) would not live to swear against him (defendant), and that he (deceased) had sworn a lie. Defendant had been indicted for stealing a mule, and thought that deceased would testify against him, and was mad. When deceased started up to the fence at defendant's house, where defendant, Rosengreen, and others were, witness advised deceased not to go, as defendant was mad; but deceased said he must see Rosengreen then, and thought defendant was only bluffing. Witness told deceased that Rosengreen would be at his (witness's) house that night, and could be seen there, but deceased said he must see him then. From here the testimony is much the same as that of Hartstrom.

Margaret Christerson was the first witness introduced by the defence. She is the mother-in-law of defendant, and first knew of the presence of deceased on the premises by hearing him swearing. "When I told defendant's wife that deceased was out there, she went out and asked deceased to leave, and not stand out there hollowing. Deceased made no reply to her. I saw defendant when his wife spoke to deceased, and did not hear him say anything. I saw defendant go into the house and come out with something

by his side, but I don't know what it was. When he (defendant) came out of the house, deceased got off of his horse. I did not see them after that, as it was twilight. I heard the shot, but could not see who fired it. Defendant then said : ' This man (the deceased) has been after my life for a long time.' Witness was at the party testified to heretofore ; went with defendant and came home with him, and knows that he carried no gun, nor brought one away." On cross-examination, the witness states that she saw a gun in defendant's hand after the shot.

Mrs. Munson, sworn for the defence, says that in 1866 she lived on the Watkins place, in Williamson County. Previous to the killing, heard the deceased say that if defendant did not keep his mule out of his ( deceased's ) pasture, he (deceased) would kill him (defendant), and the mule too. Thinks this was before the war. After figuring, witness thought this happened some fifteen or sixteen years ago.

Jonas Christerson, for the defence, testified that he was at the house the evening deceased was killed. The first he knew of deceased's presence there was hearing him talking in a loud and unfriendly voice. Saw defendant go into the house and come out with something in his hand, like a gun, and heard the shot immediately after he passed out of the house. When the defendant threw his gun on the ground, after the shooting, heard him say to his wife, " It may so happen that we are separated now for a good while." Did not see defendant after the shooting until in Georgetown, about six months ago. He and deceased disputed about the war ; sometimes had disagreements, and at times were friends. Never heard defendant make any threats against deceased.

George Richardson, for the defence, testified that he was at defendant's house when deceased and others came up. Heard defendant tell deceased to go off; to which he answered that he would go when he had seen Rosengreen.

This order and response were repeated once or twice, when defendant remarked that he had something that would make him go, and then turned and went into the house, and came back. Deceased got off his horse on the left side, with his right hand on his saddle, his left holding the bridle-rein. Saw defendant dodge, but did not see deceased throw anything. Heard a lick, and then the shot, almost together. Before deceased dismounted, he placed his right hand to his left side quickly, cursed defendant, and said, "I will kill you before I leave to-night." Defendant got the gun before deceased got off the horse. Looked at the place where deceased fell, that night and next morning. There was a stick there, and deceased's hand was on it. While the two were quarrelling, and before deceased got off the horse, saw him place his right hand to his left side quickly.

John Northington, for the defence, swears that Newlin offered him (witness being a juror), when he was summoned, two of his "best beef steers" if he would hang the jury. Newlin, for the prosecution, denies this offer under oath. Other witnesses, under oath, testify to the good character of defendant.

*Walton, Green & Hill,* for the appellant.

*George McCormick,* Assistant Attorney-General, for the State.

Winkler, J. At the September term, 1878, of the District Court of Williamson County, the appellant was tried for the murder of one August Nelson, charged in the indictment, which was presented on November 1, 1866, to have been committed in the county of Williamson, on May 17, A. D. 1866. On the trial the accused was convicted of murder in the second degree, and his punishment assessed at confinement in the State penitentiary for a period of nine years. A motion for a new trial was made and over-

ruled, and from the judgment of conviction this appeal is prosecuted.

We are not permitted to inquire into several interesting features of the case discussed by counsel for the appellant, for the reason that the record presents no such statement of the testimony adduced on the trial below as will permit an inquiry into the evidence. Indeed, counsel do not fail to realize this difficulty in the way of presenting their views of the case, and, in order to relieve themselves of this embarrassing feature, have presented an affidavit of the judge who presided at the trial, explaining how it occurred that a statement of facts was not prepared and properly certified as a part of the record. But this only makes more apparent the fact, patent on the face of the transcript, that the case is before us without a statement of facts such as the law requires.

The effects of this omission are settled by a long line of decisions, commencing soon after the enactment of the statutes on that subject. As to the manner of presenting the evidence in a criminal case on appeal, the Code of Criminal Procedure (art. 604) directs that —

" A statement of facts in a criminal action shall be agreed upon by the district attorney and the defendant, or his counsel ; and when they fail to agree, the same shall be made out and certified as directed in civil suits. In preparing a statement of facts, the rules in civil suits shall apply as to the manner and form of preparing and sending up the same."

For the rules in civil suits as to the manner and form of preparing and sending up a statement of facts, see Paschal's Digest, art. 1490. And in this respect the statute directs that the trial in the appellate tribunal shall be on a statement of facts as agreed upon by the parties, or their attorneys, certified by the judge below ; or, should the parties fail to agree, then the judge of the court below shall certify the facts. Pasc. Dig., art. 1581.

These statutes have been before the courts, and every portion, it seems, has been subjected to judicial criticism; but it is believed that it has not been held obligatory on the judge in the first instance to prepare a statement of facts in any case, either civil or criminal. On the contrary, it only becomes the judge's duty on failure of attorneys to agree. This is the evident import of the statutes on the subject, and has been so held in various decisions; and it has as uniformly been held that the approval or certificate and signature of the judge is indispensable to the validity of a statement of facts to entitle it to be considered on appeal, for any purpose. *Kelso* v. *Townsend*, 13 Texas, 140; *Lacey* v. *Ashe*, 21 Texas, 394 (since this last-named case, the rule requiring seals of attorneys or judges in certifying a statement of facts has been held as directory merely, and the signatures of attorneys and judges are held to be the proper test of authenticity). See *Branch* v. *The State*, 3 Texas Ct. App. 99; *Trevinio* v. *The State*, 2 Texas Ct. App. 90, and authorities there cited; *Keef* v. *The State*, 44 Texas, 582; *Koontz* v. *The State*, 41 Texas, 571, cited in Brooks's case, 2 Texas Ct. App. 1.

In the latter case it was said: " Without a statement of the evidence before the jury, it cannot be ascertained whether the grounds of the motion for a new trial were well taken or not;" and in that case the court declined to do more than to see that the indictment sustained the charge and the finding of the jury. See, also, the following cases reported in 3 Texas Ct. App.: *Wakefield* v. *The State*, 39; *Gindrat* v. *The State*, 573; *Roberts* v. *The State*, 47; *Booker* v. *The State*, 227; *Longley* v. *The State*, 611; *Courtney* v. *The State*, 257.

After the expiration of the term, the judge has no control over the preparation of a statement of facts. *Ferrell* v. *The State*, 2 Texas Ct. App. 399.

In Longley's case, cited above, it was said: "It is the

general rule, now well settled by a long current of decisions, that without a statement of the facts in evidence before the court and jury, this court, on appeal, will only consider whether the indictment will sustain the charge and the finding of the jury.'' See authorities there cited upon which the rule rests.

We are compelled to try a case upon the record, and whenever it is there apparent that a certain fact exists or does not exist, we are not at liberty to shut our eyes to it, whether noticed in the argument or not. It being a settled rule, without a statement of facts, not to consider more than as to whether the indictment will sustain the charge to the jury, and the finding of the jury, our labors become very much restricted in the investigation of the present case.

The case of *Trammel* v. *The State*, 1 Texas Ct. App. 121, is relied on for authority upon which the judgment in the present case should be reversed. It is only necessary to remark that the cases are entirely dissimilar.

It is urged on behalf of appellant that the judge below erred, both in admitting evidence offered by the State and in excluding evidence offered by the accused, and attempted to be drawn out of the State's witnesses on cross-examination; but, so far as we have been enabled to determine from the second bill of exceptions, in the absence of a statement of facts, we are unable to discover that the cause of the defendant was prejudiced in any material degree by any of the rulings made.

It is stated in one of the bills of exception that the defendant offered to prove by the witness John Palm the following facts: '' That he (witness) knew John Carlson and August Nelson; that after said Carlson had killed said Nelson, in May, 1866, he (witness) went to Missouri in the the year 1867 (latter part) or first of 1868, and there met Carlson, who was living openly with his family in the town

of Carthage ; that on his return to the county of Williamson, shortly after seeing said Carlson, he (witness) informed Andrew Nelson, the private prosecutor in this case, of the whereabouts of said Carlson ; that said Carlson expressed himself anxious to return to Texas and stand his trial, but that he did not possess the means to do so, and that the information was conveyed to said Nelson at the request of Carlson ; and, further, that the whereabouts of said Carlson was generally and notoriously known in the county of Williamson for many years before the spring of 1878 ; to the proof of which facts the State objected by counsel, because the same was irrelevant and immaterial." The court sustained the objection, and the defendant took a bill of exceptions to the ruling.

Another bill of exceptions states: "The defendant, on the cross-examination of the witness A. J. Nelson, offered to prove by said witness, — he himself being the private prosecutor, — for the purpose of showing the *animus* of said witness, the same to go to his credibility, that he, said witness, knew, or at least had direct and positive information as to the exact whereabouts of the defendant in the State of Missouri, from which State he was brought by requisition, for a number of years prior to the time when he took active measures to secure the arrest of defendant, it having been already shown that he did not act until [the persons named] were dead, they being parties who were present at the killing, and on whom defendant relied in defence ; to which the State, by counsel, objected, because said evidence was immaterial." The court sustained the objection, to which the defendant took a bill of exceptions. In these and kindred rulings we cannot perceive any possible injury to the accused. If the facts be, as intimated in these bills of exception, that the accused, after the homicide, went to a distant portion of the country, and there remained and lived openly with his family for a number of years prior to

his arrest, and these facts were known to the community of the homicide and to the relations of the deceased, we are unable to see that these circumstances could, if proved, have benefited the accused; and if he has so remained away until after the death of important witnesses, he so remained away at his own peril. We see no reason why he could not have returned and placed himself under the protection of the law long years before the time of his arrest and return on requisition, as mentioned in the bill of exceptions, there being no intimation that the deceased persons did not die natural deaths.

Still, we are of opinion that these questions are not properly before us, and that they cannot properly avail the appellant; unless, indeed, the bill of exceptions had contained all the evidence, when he could have, perhaps, availed himself of the rule in *Bennett* v. *Dowling*, 22 Texas, 660, where it was said: " The bill of exceptions, under the hand and seal of the presiding judge, contains a full statement of all the facts given in evidence, according to the certificate attached thereto, and was intended to embrace both a statement of facts as well as the bill of exceptions."

Another bill of exceptions recites " that, on the trial of this cause, the State having placed Andrew Nelson on the stand, and he having testified as set out in the statement of facts, the defendant offered to prove by the said witness, on further cross-examination, as follows, for the purpose of showing the *animus* of the witness, it having been admitted and proved that he was the brother of deceased, and was the private prosecutor in the cause:

" 1. That he was informed in the year 1869, by John Palm, that the defendant was openly residing in the town of Carthage, Missouri. 2. That the said defendant sent word to said witness by said Palm that he (defendant) was anxious to return and stand his trial, but that he was too poor to pay his expenses. 3. That it was generally known

in the county of Williamson for many years where defendant, Carlson, was living.; to which the State objected, because the same was immaterial.'' The objection was sustained by the court, and the defendant took a bill of exceptions.

This bill of exceptions recites a fact not before noticed,— that the alleged prosecuting witness was the brother of the deceased. We are of opinion that the naked, unexplained facts that the defendant was living openly in the State of Missouri, and that the witness did not promptly procure his arrest, or that he was a brother of deceased, were not calculated of themselves to discredit the witness further than, as already shown by the bill of exceptions, that he was the brother of the deceased, and the private prosecutor. His credibility was placed before the jury by a charge of which we see no grounds to complain.

What has already been said as to these bills of exception relates as well to others on the rulings upon the evidence.

Several objections to the charge of the court were made in the motion for a new trial, which we deem unnecessary to consider specially. As to the general charge, we fail to discover anything other than a careful regard for the law, and the rights of the State and the accused. The enunciations of the law as to murder in the first and second degrees, and of manslaughter, together with homicide in self-defence and upon previous threats, as well as the definition of express and implied malice, reasonable doubt, and the presumption of innocence, were all eminently fair and correct. And whilst we are unable to see any special necessity for the special instructions given at the instance of the prosecution, and for the accused, we fail to find in them any statement or conclusion calculated to prejudice or mislead the jury, or in any manner injure the rights of the accused.

In fact, the whole conduct of the judge, in view of able and skilful counsel, has, so far as we can determine

from the voluminous record before us, not only endeavored to, but has succeeded in holding the scales of justice with a steady and equal hand; and, judging therefrom, we feel warranted in the conclusion that if any injustice had been done the accused on the trial, the judge would have remedied the error by granting a new trial.

The apellant has been well and ably defended, and, so far as we can see, has had the full benefit of a fair and impartial trial, before a proper jury, and on a sufficient indictment, and we find nothing in the record to warrant a reversal of the judgment. The judgment is affirmed.

*Affirmed.*